**ALAMO RENT-A-CAR, INC., a Florida corporation, Plaintiff-Appellee, Cross-Appellant,**

v.

**SARASOTA-MANATEE AIRPORT AUTHORITY, a political subdivision of the State of Florida, Defendant-Appellant, Cross-Appellee.**

No. 86–3396.

United States Court of Appeals, Eleventh Circuit.

Aug. 25, 1987.

A. Lamar Matthews, Jr., Theodore C. Eastmoore, Frazer F. Hilder, Sarasota, Fla., for defendant-appellant, cross-appellee.

Howard L. Conklin, Ft. Lauderdale, Fla., Donald A. Gifford, Craig B. Gliddon, Thomas C. MacDonald, Tampa, Fla., Lucas A. Powe, Jr., University of Texas Law School, Austin, Tex., for plaintiff-appellee, cross-appellant.

Before TJOFLAT and VANCE, Circuit Judges, and ATKINS\*, Senior District Judge.

TJOFLAT, Circuit Judge:

## I.

This case presents a constitutional challenge to a local economic regulation (a user

---

\* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

fee) promulgated by the Sarasota-Manatee Airport Authority (the Authority), a local governmental agency created by the Florida legislature. The Authority owns and operates the Sarasota-Bradenton Airport (the airport). In order to meet its operating expenses and other expenses not covered by state and federal grants, the Authority has established, through negotiated agreements and unilateral resolutions, a schedule of user or privilege fees. These fees apply to a wide range of activities that are conducted on the airport's facilities, and include airplane landing fees, fees and lease payments for car rental companies located on airport property, parking fees, rent from restaurants and gift shops, and fees paid by taxis and limousines serving the airport.

In 1982, the Authority began considering measures to alleviate ground traffic congestion and to obtain revenue from operators of "courtesy vehicles," which transport customers to and from the main airport terminal and certain businesses located on the airport property. The Authority was concerned with two categories of businesses: (1) hotels and motels, and (2) off-airport car rental companies. Off-airport car rental companies, such as appellee Alamo Rent-A-Car, Inc. (Alamo), are car rental companies that do not rent facilities on airport property and thus must transport customers from the airport to their remote locations. In contrast, on-airport car rental companies lease counter space inside the airport terminal, as well as land adjacent to the terminal to be used for storing and maintaining cars.[1]

On July 27, 1982, the Authority adopted two resolutions, one governing courtesy vehicles operated by hotels and motels, and one governing the off-airport car rental companies' courtesy vehicles. The resolution concerning hotels and motels established a monthly courtesy vehicle fee of $50

or $100, depending on the size of the vehicle, or an annual fee of $800 per vehicle. The resolution governing off-airport car rental companies, including Alamo, contained an extensive series of requirements for securing courtesy vehicle permits. For example, companies seeking a permit had to provide proof of financial responsibility, identify their managerial personnel, and pay a user fee. The user fee applicable to these car rental companies was "10% of all gross business receipts derived from the rental of automobiles to passengers picked up at the Airport," payable monthly for the duration of the permit. For companies conducting a substantial volume of business involving airport passengers, such as Alamo, the ten percent fee greatly exceeds the flat fee applicable to hotels and motels.

■ On July 29, 1982, Alamo brought suit in the district court, seeking to enjoin the Authority's imposition of the ten percent user fee on it and other off-airport car rental companies. Alamo claimed that the user fee violated the equal protection clause of the United States Constitution, as well as other provisions of state and federal law not relevant to this appeal. The district court held that the user fee denied Alamo the equal protection of the laws and permanently enjoined the enforcement of the user fee being charged off-airport companies. We reverse.[2]

## II.

### A.

■ The equal protection clause of the fourteenth amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct.

---

1. There are five on-airport car rental companies at the airport: Avis Rent-A-Car, Budget Rent-A-Car, Dollar Rent-A-Car, Hertz Corporation, and National Rent-A-Car.

2. The district court's final judgment did not dispose of all of Alamo's claims for relief. *See*

*infra* note 5. Consequently, we do not have jurisdiction of this appeal under 28 U.S.C. § 1291 (1982). Because the court granted permanent injunctive relief, however, we have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) (1982).

3249, 3254, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). Legislation, such as that involved in this case, that does not impinge on fundamental rights or employ suspect classifications is presumed to be valid and will be upheld if it is rationally related to a legitimate state interest. *Cleburne Living Center,* 473 U.S. at 440, 105 S.Ct. at 3254–55. Moreover, the equal protection clause allows governmental bodies wide latitude in enacting social and economic legislation; the federal courts do not sit as arbiters of the wisdom or utility of these laws. *See id.* at 439, 105 S.Ct. at 3254; *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 469, 101 S.Ct. 715, 726, 66 L.Ed.2d 659 (1981).

In this case, the district court held that the Authority denied Alamo the equal protection of the laws on two grounds. First, the court found no rational basis for assessing a flat fee for hotel and motel courtesy vehicles while charging the similarly situated off-airport car rental companies a substantial percentage of their receipts.

Second, the court determined that the Authority also violated the equal protection clause because it treated off-airport car rental companies in a similar manner as the differently situated on-airport companies. Each on-airport car rental company has a negotiated agreement with the Authority. Pursuant to these contracts, the on-airport companies lease counter space, parking spaces, and land adjacent to the airport terminal. In return, the companies pay a fixed rent plus a ten percent concession fee on receipts from all car rentals at their airport facilities. The district court found that the Authority, by charging off-airport companies a ten percent user fee, in effect treated those companies in a manner similar to the on-airport companies, which pay a ten percent concession fee but which also receive substantial benefits from their location on the airport grounds. The court concluded that there was no rational basis for establishing comparable fees for both categories of companies.

B.

We first examine whether the Authority violated the equal protection clause in assessing a flat fee for hotel and motel courtesy vehicles while charging Alamo ten percent of the receipts attributable to its customers from the airport. The Authority's first contention on appeal is that off-airport car rental companies are not similarly situated with hotels and motels, because the two categories involve companies in different lines of business. Differences in the types of business conducted by these companies is certainly a factor in equal protection analysis, and in some cases this distinction alone may be sufficient to uphold the challenged legislation. *See Allied Stores v. Bowers,* 358 U.S. 522, 526–27, 79 S.Ct. 437, 440–41, 3 L.Ed.2d 321 (1959) ("The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value.") (citations omitted); *State Board of Tax Comm'rs v. Jackson,* 283 U.S. 527, 537–42, 51 S.Ct. 540, 543–45, 75 L.Ed. 1248 (1931) (states may establish classifications based upon the types of business transacted for purposes of regulation, excise taxes, and license taxes). As the Supreme Court observed in *Williamson v. Lee Optical,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) (citations omitted),

[t]he problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.

Even assuming, however, that off-airport car rental companies and hotels and motels are similarly situated for purposes of a user fee on courtesy vehicles, the

Authority's scheme of user fees does not lack a rational basis and is not a "wholly arbitrary act," *City of New Orleans v. Dukes,* 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) (per curiam). The Authority offers five justifications for the ten percent user fee. We need only address one of these justifications to uphold the constitutionality of that fee.[3]

The Authority sought to establish a schedule of fees that reflects the different benefits the various categories of users received from the airport. Indeed, the Authority tailored its entire schedule of fees to account for differences in vehicle use and the differing benefits realized by vehicles at the airport. As already noted, hotels and motels pay a flat fee, on-airport car rental companies pay ten percent of all receipts plus a fixed rent, and off-airport car rental companies pay ten percent of receipts from customers picked up at the airport. The Authority allows private automobiles that remain on the airport roadway to operate free of charge. Operators of airport parking lots pay fifty to seventy-

five percent of their gross receipts, or a minimum fee, whichever is higher. Taxicab operators pay access fees based on a combination of monthly license fees and of their pro rata share of a fee of 2.75 cents for each passenger who arrives at the airport on a scheduled carrier, regardless whether the passenger departs in a taxicab. Finally, limousine operators pay a monthly fee of four hundred dollars per month, or twelve percent of their gross revenues attributable to airport passengers.

■ The distinctions the Authority has drawn are based upon its rational assessment of the relative benefits and the extent of use of each category of vehicles that enter the airport.[4] In establishing these classifications, the Authority need not achieve perfection or mathematical exactitude. *Vance v. Bradley,* 440 U.S. 93, 108, 99 S.Ct. 939, 948, 59 L.Ed.2d 171 (1979). Alamo has simply failed to meet its burden of proving that this system of user fees lacks a rational basis under the relaxed standard applicable to this type of governmental action.

3. The Authority justifies the fee as a means of (1) recouping lost revenue resulting from the increasing volume of rental car business that the off-airport companies have taken from on-airport companies, which already pay revenue-based concession fees to the Authority; (2) maximizing user fee revenue; (3) patterning its user fee schedule after a similar scheme that had been upheld by a Mississippi court; and (4) eliminating the incentive on-airport car rental companies might have to leave the airport property if off-airport companies were charged a low, flat user fee.

4. The user fee schedule is well tailored to achieve this objective. For example, the fee applicable to off-airport car rental companies is ten percent of the revenue attributable to customers who arrive at these companies' places of business in a courtesy vehicle. Thus, car rental companies that rarely obtain passengers from the airport pay a low fee. *See infra* part II.C. Moreover, the Authority could rationally conclude that hotel and motel operators would not be willing to pay a ten percent fee, i.e., they would discontinue their courtesy vehicle services because the service is not an indispensable part of their business.

Alamo heavily relies on the parties' joint pretrial stipulation concerning the Authority's off-airport company resolution. That stipulation provides as follows:

The Authority's Resolution lists a number of purposes justifying its regulation of Alamo: "[T]o retire Airport Authority debts incurred for the construction of [the] Airport facilities; to pay for Airport equipment; protect the public; preserve order; provide for the public health, safety and welfare, enhance the welfare of the Authority; and govern the Airport." (Section 1, Resolution). Insofar as the predicate for regulation of Alamo is the access to and use of Airport facilities by shuttle vans, the Authority no where [sic] indicates [in its resolution] why achievement of those purposes requires treating Alamo in so strikingly different a manner from the operators of other vans who are identical to Alamo in all respects save their not being in the rental car business.

This stipulation does not persuade us that the Authority's user fee lacks a rational basis. A governmental body is not required to articulate its purposes when enacting legislation. *See Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) ("'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.'") (citation omitted). Moreover, the district court did not expressly rely on this stipulation, which merely states that the Authority did not describe the justification for its schedule of user fees when it enacted the fee applicable to Alamo.

For example, this court recently upheld the City of Atlanta's limousine rate structure, which had been challenged on equal protection and commerce clause grounds. *See Executive Town & Country Servs. v. City of Atlanta*, 789 F.2d 1523 (11th Cir. 1986). The plaintiff in that case, a limousine operator, contended that the city established an unduly high minimum fare and that "the new regulations will allow the taxicab industry to regain a portion of the transportation market that the limousine service had held as a result of competition in the free market." *Id.* at 1527. The city defended its rate structure as a means of (1) giving each mode of transportation a "niche" in the city's transportation network, (2) providing affordable transportation, (3) assuring that operators of each mode of transportation earn sufficient revenue to meet their operating expenses, and (4) assuring that each mode of transportation will attract a sufficient number of customers to remain economically viable. *Id.* at 1527 n. 8. Although noting that "[t]he city's reasons for legislating these minimum fare regulations are not very compelling in a free market system," *id.* at 1528 (footnote omitted), the court held that the rate structure passed muster under the rational basis test.

Similarly, in *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), the Supreme Court upheld a Minnesota statute banning the retail sale of milk in nonreturnable, nonrefundable plastic containers while permitting the sale of similar containers made of other materials. The Court noted that the relevant inquiry for equal protection purposes is not whether the legislation will in fact further its articulated purposes, but rather whether the legislature could rationally have concluded that the purposes would be achieved. *Id.* at 466, 101 S.Ct. at 725. As long as the justification for the law is "at least debatable," there is no denial of the equal protection of the laws. *Id.* at 469, 101 S.Ct. at 726 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938)).

Under the standards articulated by the Supreme Court and this circuit, we conclude that the differing schedule of user fees applicable to off-airport car rental companies and hotels and motels is rationally related to the legitimate objectives of the Authority. In particular, the fee structure arguably accounts for the differing benefits that the operators of courtesy vehicles receive from their use of the airport.

## C.

The second issue this appeal presents is whether the Authority violated the equal protection clause because it allegedly treated off-airport car rental companies in a similar manner as the differently situated on-airport companies. As we have noted, pursuant to negotiated contracts with the Authority, on-airport companies lease counter space, parking spaces, and land adjacent to the airport terminal. In return, these companies pay a fixed rent and a ten percent concession fee on receipts from all car rentals at their airport facilities. The district court held that the Authority denied Alamo the equal protection of the laws because there was no rational basis for charging off-airport companies a ten percent user fee while not according them the substantial benefits that the on-airport companies receive from their location on the airport grounds.

The district court did not resolve Alamo's contention "that the real purpose of the challenged resolution involved an improper motive to protect the authority's lessees [the on-airport companies] and promote their competitive advantage by requiring the off-airport companies to pay to the Authority the same percentage of gross receipts for an entirely different (and much less valuable) *quid pro quo*." Rather, the court assumed that the legitimate purposes the Authority offered to support the user fee were the actual objectives of the fee and concluded that the Authority could not rationally further those goals with its scheme of user fees.

 We follow a similar approach but reach the opposite conclusion. Our review of the record reveals no substantial evi-

dence that the Authority purposefully sought to place off-airport companies at a competitive disadvantage in relation to the on-airport companies. Although the Authority's schedule of fees may have the *effect* of placing some off-airport companies, such as Alamo, at a competitive disadvantage, the scheme will withstand equal protection scrutiny if it is rationally related to a legitimate governmental objective.

The Authority offers two closely related justifications for its schedule of user fees. First, because the Authority receives no concession fee when an airport passenger purchases the services of an off-airport car rental company instead of an on-airport company, the Authority sought to restore that lost revenue by assessing a ten percent user fee on the off-airport companies. Second, the Authority sought to maximize its revenues by charging the off-airport companies a fee based upon the benefits they receive from use of the airport.

■ Revenue raising is undoubtedly a legitimate and substantial governmental objective. *See Gannett Satellite Information Network v. Metropolitan Transp. Auth.*, 745 F.2d 767, 775 (2d Cir.1984); *see also Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 2717–18, 41 L.Ed.2d 770 (1974) (plurality) (protecting revenue derived from long-term commercial advertising justifies public transit system's restriction on political advertisements). The Authority's interest in raising revenue and preventing wide fluctuation in its receipts is particularly strong because Florida law requires it to meet all those expenses not covered by government grants by collecting various user fees. *See* 1977 Fla. Laws, ch. 651, at § 6.

■ The Authority's schedule of user fees is rationally related to its revenue-raising goal. First, the off-airport company user fee is designed to fluctuate based upon the number of airport passengers who purchase car rental services. The ten percent user fee only applies to "passengers picked up at the Airport" by a courtesy vehicle; the fee does not apply to car rental customers who are not transported from the airport. Thus, as the record demonstrates, an off-airport car rental company that serves few airport passengers will pay a small fee, which in some cases will be *lower* than the flat fee that hotel and motel courtesy vehicle operators must pay. On-airport car rental companies, on the other hand, must pay ten percent of the revenues they receive from *all* customers.

Second, we cannot give great weight to Alamo's contention that the on-airport companies receive substantially greater benefits in return for their fees than do the off-airport companies. It is true that the on-airport companies are able to conduct their business on the airport property. As the district court found, the on-airport companies receive substantial advantages from their presence in the airport, including "overall customer convenience" and access to "walk up" customers, i.e., customers who do not have reservations to rent a car from a particular company. The on-airport companies, however, pay negotiated rents for the space they lease in the airport terminal and on the airport grounds. Although these rents may be below the actual market value of the property, they do compensate the Authority for the benefits that the on-airport companies receive. Moreover, the courts must be chary of second-guessing governmental pricing decisions such as this rental charge.

Finally, we note that the on-airport companies attained their positions in a competitive bidding process, and that their off-airport competitors, including Alamo, can displace them when their contracts with the Authority expire. The Authority thus has not created a protected class of on-airport companies with privileges permanently unavailable to other competitors. If Alamo and other off-airport companies find the positions of the on-airport companies to be desirable, they will be free to enter the bidding process and perhaps displace one of those companies.

In sum, we find that the Authority's schedule of fees for off-airport companies and a fixed rent and fees for on-airport companies is rationally related to its objectives of maximizing revenue and obtaining fees from all car rental companies regard-

less of whether they operate on the airport property. The Authority could rationally conclude that all car rental companies receive benefits from the presence of the airport. Its decision to establish a ten percent fee for off-airport companies was not unreasonable, particularly because the fee only applies to car rental customers who arrive at the airport and use the courtesy vehicles. Although this fee may harm off-airport competition in general and Alamo's profitability in particular, the fee schedule withstands constitutional scrutiny. *See Executive Town & Country Servs. v. City of Atlanta*, 789 F.2d 1523, 1527–28 (11th Cir.1986) (upholding city's limousine rate structure despite its detrimental effect on limousine services relative to taxicab operators and despite the fact that the city's justifications for the regulations "are not very compelling in a free market system").

### III.

We reverse the district court's judgment on Alamo's equal protection challenge. Because the district court did not reach several of Alamo's alternative grounds for relief,[5] we remand for consideration of those contentions.

REVERSED and REMANDED.

---

5. The district court did not reach Alamo's claims that the user fee (1) constituted an unreasonable burden on interstate commerce, (2) denied it due process of law in violation of the fourteenth amendment and of the Florida Constitution, and (3) was enacted in violation of Florida's Government in the Sunshine Law, Fla. Stat. § 286.011 (1985).